**801 CONKLIN STREET LTD., a New York Corporation, d/b/a the Crystal Café, Plaintiff,**

v.

**The TOWN OF BABYLON, by and through the Town Board of the Town of Babylon, Defendant.**

No. 95–CV–3062(JS).

United States District Court, E.D. New York.

March 9, 1999.

Daniel Patrick O'Brien, O'Brien & O'Brien, Newconset, NY, Luke Charles Lirot, Lirot Dolan, P.A., Tampa, FL, for plaintiff.

John J. Burke, Jr., Town Attorney, Andrew Brick, Assistant Town Attorney, Town of Babylon, Lindenhurst, NY, for defendant.

## MEMORANDUM AND ORDER

SEYBERT, District Judge.

Pending before the Court are cross-motions for summary judgment in Plaintiff's constitutional challenge to Defendant's zoning ordinance.

## PROCEDURAL BACKGROUND

Plaintiff 801 Conklin Street, Ltd., a New York Corporation doing business as the "Crystal Cafe" (hereinafter "Plaintiff" or "Crystal"), commenced this action against the Town of Babylon (hereinafter "Defendant" or the "Town"), seeking a declaratory judgment declaring unconstitutional the Town's Adult Use Business Legislation (references to the Babylon Town Code are hereinafter referred to as the "Code"). In addition, Crystal asserts that preliminary and permanent injunctions enjoining the Town from enforcing the Code are required to protect its federal constitutional rights. Although the complaint alleged violations of both the United States and New York State constitutions, the cross-motions for summary judgment do not raise or discuss the state law claims.

Pending before the Court are Crystal's first amended motion for summary judgment and the Town's cross-motion for summary judgment. Crystal seeks: (1) summary judgment pursuant to Federal Rule 56(b) due to the constitutional infirmities of the applicable Code sections, and (2) an injunction preventing enforcement of the Code to the detriment of Crystal. The Town seeks: (1) an order granting summary judgment on all matters for which there exist no genuine issues of material fact, and (2) a denial of Crystal's motion for summary judgment on any matter for which there does exist an issue of fact.

## FACTUAL BACKGROUND

The facts as set forth below, unless otherwise indicated, are not in dispute. Defendant, Town, by and through the Town Board of the Town of Babylon, is a Municipal Corporation and political subdivision of the State of New York, whose authority to enact and enforce zoning laws, regulations and ordinances is duly governed and limited by the State of New York. (Pl.'s "Statement of Material Facts" ¶¶ 1, 2, pursuant to Local Rule 56.1 (hereinafter "56.1").)

Plaintiff, Crystal, is a recognized legal entity with its principal place of business located in the Town of Babylon, Suffolk County, New York State. (Pl.'s 56.1 ¶ 1.) Crystal is a duly organized New York corporation operating a business that offers entertainment to the public in the form of recorded music and exotic dance performances. Crystal's business is within that class of land uses generally defined as an "adult entertainment cabaret," in Section 213–377 of the Code. (Pl.'s 56.1 ¶¶ 3, 7; Code § 213–377.) Section 213–377 defines all types of businesses that are treated as an "Adult Use" under the Code.

The expressive content of the dance performances, performed by independent professional artists and/or employees, includes an emphasis on sexual expression and the interest in human sexuality. The occasional exposure of various specified anatomical areas is an integral component of

the expressive impact of the performance. (Pl.'s 56.1 ¶ 3.) Crystal's primary source of income was and is derived from public appeal, demand, and commerce in the expressive performances, for which the business receives remuneration directly from patrons and customers, as well as commerce in other ancillary hospitality services. (Pl.'s 56.1 ¶ 5.)

The parties agree that: (1) the performances offered by Crystal are not obscene as contemplated by contemporary standards and are protected activities under the First Amendment; (2) the performances are offered to the public for the specific purpose of presenting expressive matter of literary, artistic, political or scientific value; (3) the performances which take place at Crystal do not appeal to any prurient interest; and (4) as such, they are entitled to some level of First Amendment protection. (Pl.'s 56.1 ¶ 6.)

The parties disagree as to whether Crystal's operation preceded enactment of the applicable Code Section. Crystal claims that it provided the expressive dance performances described above for a significant period of time prior to the establishment or adoption of the Code, (Pl.'s 56.1 ¶ 8.), whereas the Town contends that Crystal incorporated and purchased the property and business subsequent to the adoption of the Code. (Def.'s 56.1 ¶ 1.)

On November 4, 1987, the Town advertised a public hearing ("Hearing") scheduled for, and held on November 17, 1987, at the Town House. Various individuals addressed the Town Board. (Def.'s 56.1 ¶¶ 9, 10.) Residents voiced concern over the impact that various Adult Use establishments could have on moral decency, the upbringing of children, and, to some degree, property values in the community. (Public Hearing of the Town Board, Town of Babylon, (hereinafter "Hearing"), at 3, 4, 7, 8 (filed as Exhibit B to Defendant's Notice of Cross–Motion For Summary Judgment, Opposition to Plaintiff's Motion for Summary Judgment, Objections to Plaintiff's Affidavit and Defendant's Memorandum of Law.)) Comments about similar zoning provisions enacted in the Town of Islip generally revolved around the fact that its constitutionality has been upheld in other courts. (Hearing at 3,4, 5, 7.) It was expressed at the Hearing that similar concerns exist in Babylon which could be remedied by such a provision. (Hearing at 3–4.) The adoption of the subject legislation is reflected in the Babylon Town Code as being enacted December 15, 1987, by Local Law Number 11–1987. (Pl.'s 56.1 ¶ 10.)

The legislation purports to regulate the location of "Adult Uses" throughout the Town by prohibiting Adult Uses from: (a) locating within a 500 foot radius of any area zoned for residential use; (b) locating within a one-half mile radius of another Adult Use; and (c) locating within a 500 foot radius of any school, church, or other place of religious worship, park, playground, or playing field. (Pl.'s 56.1 ¶ 11; Code § 213–378.) In designating the setbacks specified above, the legislation gives no definition or description as to any formula for measurement (i.e., door to door; property line to property line; the shortest route of pedestrian traffic). (Pl.'s 56.1 ¶ 12.) Prior to the adoption of the legislation, there was no other legislation in place purporting to regulate adult use businesses in the Town differently than any other commercial site of public assembly. (Pl.'s 56.1 ¶ 13.)

The legislation provides that "Adult Uses" would be allowable only in any industrial district and only as a special exception by the "Board of Appeals after Public Hearing." (Pl.'s 56.1 ¶ 14; Code § 213–376(A).)

The legislation sets forth "purposes and considerations" as follows:

(1) In the execution of this Article, it is recognized that there are some uses which, due to their very nature, have serious objectionable characteristics. The objectionable characteristics of these uses are further heightened by

their concentration in any one (1) area, thereby having deleterious effects on adjacent areas. Special regulation of these uses is necessary to ensure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhoods or land uses; (2) It is further declared that the location of these uses in regard to areas where our youth may regularly assemble and the general atmosphere encompassing their operation is of great concern to the Town of Babylon; (3) These special regulations are itemized in this Article to accomplish the primary purposes of preventing a concentration of these uses in any one (1) area and restricting their accessibility to minors. (Pl.'s 56.1 ¶ 14; Code § 213–376(B).)

By virtue of the locational restrictions imposed by the subject legislation, after January 1, 1993, any pre-existing "nonconforming use" was to have terminated operation by that date and any business attempting to relocate would be subject to the Code's limitations pursuant to which they may be legally established or operated within the jurisdictional limits of the Town. (Pl.'s 56.1 ¶ 16.)

By Local Law, Special Exception Use Permits was added to the Babylon Town Code on April 8, 1988. (Pl.'s 56.1 ¶ 18; L.L. No. 2–1988.) The legislative findings enumerated in Section 213–382 state in part that the Board has "articulated the standards that it will duly consider in determining the imposition of conditions it may place upon particular uses of land in order to protect abutting landowners...." (Pl.'s 56.1 ¶ 18; Code § 213–382.)

Under Article XXXII, Section 213–383, General Standards for issuance, fourteen (14) separate and distinct findings must be made to establish a "special exception" that is not "permitted by right." (Pl.'s 56.1 ¶ 18; Code § 213–383(A).) Prior to a special use permit being issued, the Town Board must find:

(1) Such use is reasonable, necessary and will be in harmony with and promote the general interests and welfare of the surrounding community;

(2) The neighborhood character and surrounding property values are reasonably safeguarded;

(3) The proposed use will not prevent the orderly and reasonable use of adjacent property;

(4) The site is particularly suitable for the location of such use in the community;

(5) The access facilities are adequate for the estimated traffic from public streets, so as to ensure the public safety and to avoid traffic congestion;

(6) There is room for creation of off-street parking and truck-loading spaces at least in the number required by the applicable provisions of this chapter, but in any case, adequate for the actual anticipated number of occupants of the proposed use, whether employees, patrons or visitors, and, further, that the layout of the spaces and related facilities can be made convenient and conducive to safe operation;

(7) The proposed use will not pose risks to the public health or safety;

(8) The characteristics of the proposed use are not such that its proposed location would be unsuitably near to a church, school, theater, senior citizens' residence, recreational area or other place of public assembly;

(9) Adequate buffer yards and screening can be provided to protect adjacent properties and land uses from possible detrimental impacts of the proposed use;

(10) Adequate provision can and will be made for the collection and disposal of stormwater runoff, sewage, refuse and other liquids, solid or gaseous waste which the proposes use will generate;

(11) The natural characteristics of the site are such that the proposed use may be introduced there without undue disturbance of destruction of important natural features, systems or processes

and without significant negative impact to groundwater and surface water on and off the site;

(12) The lot area is sufficient, appropriate and adequate for the use, as well as reasonably anticipated operation expansion thereof;

(13) The proposed use can and will comply with all provisions of this chapter and of the code which are applicable to it and can meet every other applicable federal, state, county and local law, ordinance, rule or regulation; and

(14) The proposed use will not result in unacceptable levels of noise, vibration, smoke, dust, odor, fumes or noxious gases, nor negatively impact upon air quality.

(Pl.'s 56.1 ¶ 19; Code § 213–383(A).)

In addition, Subsection (B) provides:

"Before any special exception use permit is issued, the Town Board shall determine that all applicable requirements of this chapter have been met and may impose any additional requirements to assure that the standards stated in Subsection A will be met. The Town Board may impose such additional conditions as it deems appropriate to ensure the purposes set forth in Subsection A, including but not limited to: (1) A limit on hours of operation upon a finding that such a limit is necessary to the conditions set forth in this section; (2) A requirement that the applicant post a bond with sufficient surety upon a finding that such bond is necessary to protect the value of the property, character of the neighborhood and the public health and safety."

(Pl.'s 56.1 ¶ 19; Code § 213–383(B).) Pursuant to Section 213–385, a public hearing is required and "shall be on ten (10) days notice to the public ..." (Pl.'s 56.1 ¶ 20; Code § 213–385.) The Code provides no specific direction regarding the scheduling or deadline for any such public hearing. (Pl.'s 56.1 ¶ 20.)

On January 24, 1995, a letter was sent from the Town attorney advising Crystal that "pursuant to Babylon Town Code Section 213–381, your right to operate an adult use as defined by Babylon Town Code Section 213–377 at your present location has expired". (Pl.'s 56.1 ¶ 21; Compl. Ex. D.) On May 30, 1995, a letter was sent from the Town attorney, to Crystal's previous counsel, advising Crystal that:

Please take notice that your client must cease operating an Adult Use from his location within 60 days from the date of this letter, after which the Town will take all action necessary to enforce the provisions of the Babylon Town Code regulating Adult Use as it applies to your client. This action will include seeking an injunction and the issuance of criminal summonses.

(Pl.'s 56.1 ¶ 22.)

Plaintiff asserts that pursuant to the Code, no Adult Use can begin operating in the Town without approval and issuance of a Special Use Permit, the issuance of which requires actions by the Town's Planning Commission, Board of Appeals and Town Board. (Pl.'s 56.1 ¶ 23.) In support, Plaintiff avers that there is no time limit set forth in any Town document as to when an Adult Use's application for a Special Use Permit must be considered as complete and ready for consideration by the Planning Commission. There is also no time limit set forth in any Town document as to when the Planning Commission, Board of Appeals or Town Board must rule on an application by an Adult Use for a Special Use Permit. In addition, there is no indication in any Town document of a limit or restraint on the ability of the Town to impose conditions predicating the issuance of a permit for an Adult Use. Finally, the Plaintiff maintains that there is no severability clause in the Code. (Pl.'s 56.1 ¶¶ 25–30.)

## DISCUSSION

### I. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment may not be granted unless "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under the law of the Second Circuit, a district court must weigh several considerations in evaluating whether to grant a motion for summary judgment with respect to a particular claim. *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted). *Gallo* articulated the following steps: (1) the moving party carries the burden to demonstrate that no genuine issue respecting any material fact exists; (2) all ambiguities and inferences must be resolved in favor of the non-moving party; (3) the moving party may obtain summary judgment by showing that no rational jury could find in favor of the non-moving party because the evidence to support its case is so slight; and (4) the trial court's duty is confined to issue-finding and does not extend to issue-resolution. *Id.*

In evaluating the above considerations, a court must be mindful of whether the purported factual dispute is material, because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## II. STANDARD FOR GRANTING PRELIMINARY INJUNCTIONS FOR CLAIMS OF FIRST AMENDMENT VIOLATIONS

■ In general, the granting of a preliminary injunction requires the moving party to demonstrate both irreparable harm and a likelihood of success on the merits. *NAACP v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir.1995) (citing *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991)). "A violation of the First Amendment of the Constitution itself constitutes irreparable harm." *Hickerson*

*v. City of New York*, 997 F.Supp. 418, 420 (S.D.N.Y.1998) (citing *Elrod v. Burns*, 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976)). "Accordingly, when an injunction is sought to protect First Amendment rights, likelihood of success on the merits and irreparable harm merge into a single threshold requirement." *Id.*

## III. THE CONSTITUTIONALITY OF "ADULT USE" ZONING LEGISLATION

This case presents a problem faced and resolved by courts across the nation: how to measure the individual's right to engage in constitutionally protected activities against the community's right to implement zoning changes to address local concerns. Fortunately, when these two rights collide, a balance has emerged requiring each side to compromise, yet not relinquish, inherent constitutional protections.

### 1. Exotic Dance Is A Constitutionally Protected Activity

■ Defendant does not challenge the premise that Crystal's operation is a protected activity, because, non-obscene exotic dance performances are entitled to First Amendment protection. *See Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 65, 101 S.Ct. 2176, 2181, 68 L.Ed.2d 671 (1981) (holding that nude dancing is not without First Amendment protection); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991) (recognizing that nude dancing is expressive conduct). The Supreme Court has decided, however, that all First Amendment expression is not entitled to the same level of constitutional protection. *See United States v. O'Brien*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968) (rejecting the argument that all symbolic speech is entitled to full First Amendment protection). Specifically, exotic dance and erotic materials are not accorded the full spectrum of protection provided under the First Amendment. *See, e.g., Barnes*, 501 U.S. at 565, 111 S.Ct.

at 2460 (indicating that nude dancing is marginally within the outer perimeters of the First Amendment); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976) (finding "society's interest in protecting [erotic material] expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate"); *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975) ("the customary 'barroom' type of nude dancing may involve only the barest minimum of protected expression").

■ However, once an activity is protected, regulations may not be content based, therefore, because exotic dance is a protected activity, a municipality may not discriminate in its regulations based on the content of such expression. *See, e.g., Lakeland Lounge of Jackson, Inc. v. City of Jackson*, 973 F.2d 1255, 1257 (5th Cir. 1992) ("[c]ities may not regulate sexually oriented establishments out of mere distaste for the message they communicate."). Accordingly, Crystal has a constitutionally protected right to exhibit exotic dancing which may be subject to content-neutral regulations.

## 2. Zoning Decisions Are Accorded Great Deference

■ Notwithstanding Crystal's First Amendment rights, the Town of Babylon has a right to exercise its presumptively valid zoning powers. *See Lighthouse Shores Inc. v. Town of Islip*, 41 N.Y.2d 7, 390 N.Y.S.2d 827, 359 N.E.2d 337 (1976); *cf. Moore v. City of East Cleveland*, 431 U.S. 494, 498 n. 6, 97 S.Ct. 1932, 1935 n. 6, 52 L.Ed.2d 531 (1977) (land use regulations are violative of the Due Process Clause if they are " 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare.' ") (quoting *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926)). In *Lighthouse Shores* the New York Court of Appeals established the standard for in-validating municipal legislation as unconstitutional, stating:

> While [the presumption of constitutionality] is rebuttable, unconstitutionality must be demonstrated beyond a reasonable doubt and only as a last resort should courts strike down legislation on the ground of unconstitutionality. The ordinance may not be arbitrary. It must be reasonably related to some manifest evil which need only be reasonably apprehended. It is also presumed that the legislative body has investigated and found the existence of a situation showing or indicating the need for or desirability of the ordinance, and, if any state of facts known or to be assumed, justifies the disputed measure, this court's power of inquiry ends.

*Id.*, 41 N.Y.2d at 11–12, 390 N.Y.S.2d at 830, 359 N.E.2d 337. *See also Town of North Hempstead v. Exxon Corp.*, 53 N.Y.2d 747, 749, 439 N.Y.S.2d 342, 342, 421 N.E.2d 834 (1981) (finding the legislation valid even in the absence of relevant legislative findings, because "So long as there is evidence that the question is at least debatable, the legislative judgment is not irrational").

In still another explication of the power of municipalities to implement land use controls, the New York Court of Appeals indicated that, as a starting point, "[i]f the issue is 'fairly debatable', the legislative judgment on the necessity for such regulation is to be respected by the courts." *Town of Islip v. Caviglia*, 73 N.Y.2d 544, 551, 542 N.Y.S.2d 139, 141, 540 N.E.2d 215 (1989) (citing *Euclid*, 272 U.S. at 388, 47 S.Ct. at 118). As the Supreme Court noted, zoning to preserve the character of specific areas of a city is " 'the most essential function performed by local government for it is one of the primary means by which we protect that sometimes difficult to define concept of quality of life.' " *Young*, 427 U.S. at 80, 96 S.Ct. at 2457 (quoting *Village of Belle Terre v. Boraas*, 416 U.S. 1, 13, 94 S.Ct. 1536, 1543, 39 L.Ed.2d 797 (1974)).

### 3. Free Speech and Zoning Ordinances Converge

■ In evaluating a zoning ordinance that impacts on "adult" establishments, the Supreme Court in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) decided the proper standard of review to apply. As outlined by the New York State Court of Appeals in *Town of Islip,* the *Renton* rule

> permits municipalities to regulate such uses through the zoning power if they can establish that (1) the 'predominate purpose' of the ordinance is not to control the content of the material purveyed but to control the 'secondary effects' of such uses on the surrounding community, (2) the ordinance is designed to serve a substantial governmental interest, (3) it is narrowly tailored to affect only the category of uses that produce the unwanted effects and (4) it allows for reasonable alternative avenues of expression.

73 N.Y.2d at 552, 542 N.Y.S.2d at 142–44, 540 N.E.2d 215.

■ A zoning ordinance intended to regulate the adverse secondary effects associated with adult uses may be considered a valid content-neutral time, place and manner restriction. *Renton,* 475 U.S. at 49, 106 S.Ct. at 929–30 (stating that "at least with respect to businesses that purvey sexually explicit materials, zoning ordinances designed to combat the undesirable secondary effects of such businesses are to be viewed under the standards applicable to 'content-neutral' time, place and manner regulations."); *see also Young,* 427 U.S. at 70, 96 S.Ct. at 2453 (holding that protecting character of city's neighborhoods is a legitimate interest).

■ Although the restriction must be unrelated to the expression of free speech, i.e., content-neutral, the government may still examine content to determine whether such expression is protected by the First Amendment, and if so, to determine the appropriate government response, i.e.,

which rule should apply. *Id.,* 427 U.S. at 69, 96 S.Ct. at 2452. As the New York Court of Appeals recently explained, "[t]he test under both *Islip* and *Renton* is not whether the regulated establishments are defined without reference to content but whether the ordinance's goal is unrelated to suppressing that content." *Stringfellow's of New York Ltd. v. City of New York,* 91 N.Y.2d 382, 399, 671 N.Y.S.2d 406, 417, 694 N.E.2d 407 (1998). Therefore, the government may create regulatory classifications based on content that distinguish between "adult" and other businesses. *Young,* 427 U.S. at 70, 96 S.Ct. at 2452 ("[f]or the regulation of the places where sexually explicit films may be exhibited is unaffected by whatever social, political, or philosophical message a film may be intended to communicate ...").

### A. Predominant Purpose Analysis

Applying the four *Town of Islip* factors to the instant case, the first consideration involves the "predominant purpose" of the Town in enacting the Code. Although merely requiring the inclusion in the Town's Code of the incantation "to eliminate secondary effects of adult uses," would effectively render the First Amendment protections impotent, because legislative intent is presumptively valid, this first condition is readily satisfied. *See Renton,* 106 S.Ct. at 929 (holding district court's finding as to predominate intent sufficient because the "ordinance by its terms is designed to prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life and not to support the expression of unpopular views") (internal quotations omitted).

Subsequent courts have held that *Renton* requires little more than general, nonscientific and conclusory statements about the sexually oriented businesses and their negative secondary effects for a city to meet its burden of proof. *See, e.g.,*

*Barnes,* 501 U.S. at 569, 111 S.Ct. at 2462 (finding constitutional the enactment of a public indecency statute designed to protect morals and public order, in part, because "[t]he traditional police power of the States is defined as the authority to provide for the public health, safety, and morals, and we have upheld such a basis in legislation," notwithstanding the complete lack of legislative history for the indecency statute); *Stringfellow's,* 91 N.Y.2d at 397, 671 N.Y.S.2d at 414, 694 N.E.2d 407 (finding from "amendments' legislative history that ameliorating the negative social consequences of proliferating adult uses was the City's only goal"); *Town of Islip v. Caviglia,* 141 A.D.2d 148, 160, 532 N.Y.S.2d 783, 790 (2d Dep't 1988) (finding subject ordinance "is not aimed at the content of the books but, rather, at the effect of the bookstore upon the community and its quality of life").

Still, an examination of the Code itself and the Public Hearing held to discuss the legislation is necessary. As reproduced *supra,* Article XXXI § 213–376(B) defines the "purposes and considerations" of the Adult Use District ordinance. "Adult Uses" are defined to include the following businesses: (1) adult bookstore; (2) adult drive-in theater; (3) adult entertainment cabaret; (4) adult motel; (5) adult theater; (6) massage establishment; and (7) peep show. Code § 213–377. The common defining characteristics are that the business excludes any minor by reason of age while providing some form of adult entertainment.

At the Public Hearing, the Town Council presided over a public meeting and fielded questions from residents who expressed a wide variety of concerns including the impact of the quality of development of young people and their protection from the influence of outside forces, public morality, property values, the breadth of the proposed legislation and its potential impact on book and video stores. In response to a question concerning video stores, Supervisor Noto answered, "I think we've got to remember the major concern was the exposure to our children, to the teenagers, the fact that what those elements bring into the residential community now exposes our families as well as our as our children again." (Hearing at 7.) Later on he indicated "basically what's happening is to keep it from being in a residential community, or even close to it, or a main throughfares where children will be exposed to it and if its going to happen, let it happen somewhere where it's less obscene to the community." (Hearing at 8.)

Although a majority of the public residents in attendance may have preferred to ban all adult entertainment in the community, the purpose of the Code section in issue was intended to primarily address the perceived consequential adverse effects that arise in the areas adjoining adult use businesses, with particular regard for the vulnerable youth. In analyzing the predominant purpose, "courts do not invalidate a municipal zoning ordinance simply because one or more legislators sought to suppress protected suppression.... it is the motive of the Legislature, not individual legislators, that is controlling." *Town of Islip,* 73 N.Y.2d at 553 n. 2, 542 N.Y.S.2d at 143 n. 2, 540 N.E.2d 215.

Based on the purposes and considerations of the Code section at issue, and the Hearing preceding its enactment, the Court concludes that the Town's predominant purpose was concerned with the consequences, and not the content, of the protected activity. Accordingly, the Code is analyzed as a "content-neutral" time, place and manner regulation.

## B. Substantial Governmental Interest Analysis

■ Plaintiff's primary contention is that the Town lacked a proper predicate for the adoption of the subject legislation, and additionally asserts that the legislation was enacted for an improper purpose. Plaintiff asserts that a municipality may not enact a regulation for which there was no pre-enactment evidence on the record

to support its interest. *11126 Baltimore Blvd. v. Prince George's County*, 886 F.2d 1415, 1425 (4th Cir.1989), *vacated on other grounds*, 496 U.S. 901, 110 S.Ct. 2580, 110 L.Ed.2d 261 (1990). Arguing that the assertion of a state interest in not enough, rather, the state interest must have a basis in fact that was considered in passing the ordinance. *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1215 (5th Cir.1982) (citing *Schad*, 452 U.S. at 73, 101 S.Ct. at 2184–85). In addition, Plaintiff avers that a municipality may not just merely mimic another ordinance that has passed constitutional muster in another context. *Krueger v. City of Pensacola*, 759 F.2d 851, 855 (11th Cir.1985); *Basiardanes*, 682 F.2d at 1213.

Plaintiff's reliance on *Basiardanes* and *Krueger* is misplaced in light of the Supreme Court's clear pronouncement in *Renton*. A city, in enacting a time, place and manner regulation, must establish that a substantial government interest exists in support of its ordinance. *Renton*, 475 U.S. at 51, 106 S.Ct. at 928. Plaintiff suggests that Defendant's failure to undertake its own study to substantiate the legislation is fatal. However, *Renton* clearly countenances reliance on the experience of other cities, stating, "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." 475 U.S. at 51, 106 S.Ct. at 931; *see also Buzzetti v. City of New York*, 140 F.3d 134, 140 (2d Cir.1998) (finding "reliance on studies from a variety of other areas of the country was well-placed"). Furthermore, local legislative bodies can take notice of or assume matters of common knowledge or experience. *See Wall Distributors, Inc. v. City of Newport News*, 782 F.2d 1165, 1169 n. 7 (4th Cir.1986) (upholding the passage of regulations where at the time of enactment the legislative body had little more

before it than expressions of concern by citizens and government officials).

The New York Court of Appeals recently underscored this sentiment by declaring "[n]on-empirical, anecdotal evidence that is comprised of the local studies does not render those studies worthless. In the proper context, anecdotal evidence and reported experience can be as telling as statistical data and can serve as the legitimate basis for finding negative secondary effects, particularly where, as here, the non-empirical information is extensive and indicative of a clear relationship between adult uses and urban decay." *Stringfellow's*, 91 N.Y.2d at 400, 671 N.Y.S.2d at 416, 694 N.E.2d 407.

At the Hearing, a citizen shared his observations made while picketing an adult bookstore in the community, stating:

> we have witnessed prostitutes soliciting and selling their services in open view on Sunrise Highway. Only women who are desperate and drug dependent can be involved in such activities in this day of 85 sexually transmitted diseases. Because these women are drug dependent, the crack dealers must be always nearby to feed their habit. While the pockets of the porno viewer are filled with cash, our property values decrease because of the cheap, honky tonk appearance of our town.

(Hearing at 4.) Whether this observation is meretricious is of no moment, because legislators may act on various unprovable assumptions as "[n]othing in the Constitution prohibits a State from reaching such a conclusion and acting on it legislatively simply because there is no conclusive evidence or empirical data." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61, 93 S.Ct. 2628, 2637–38, 37 L.Ed.2d 446 (1973).

Courts in this circuit have approved zoning ordinances enacted to address adverse secondary effects of adult uses upon a showing of even slight legislative predicate and in large measure reliant on the experiences and studies of other communities and/or on anecdotal evidence. *See, e.g.,*

*Hickerson v. City of New York,* 146 F.3d 99, 105 n. 4 (2d Cir.1998) (finding report indicated that "the negative perception of adult enterprises held by the business community and the public itself results in disinvestment, with the concomitant deterioration in the social and economic well-being of the surrounding area"); *Tri–State Video Corp. v. Town of Stephentown,* No. 97–CV–965, 1998 WL 72331, *7 (N.D.N.Y. Feb. 13, 1998) (finding municipality was entitled to rely on the experiences of other cities in enacting the ordinance even though it had not experienced the same negative effects as the municipality it based its research upon); *O'Malley v. City of Syracuse,* 813 F.Supp. 133, 146 (N.D.N.Y.1993) (concluding the city need not make an independent finding that stripper establishments will have harmful secondary effects on the surrounding neighborhoods but could rely upon the experiences of other municipalities).

Throughout the Hearing, reference is made to the Islip study, and as a neighboring town, Islip's experiences are quite relevant. The record supports the conclusion that the Town utilized the Islip ordinance as a paradigm of a constitutional exercise of a town's zoning power, and not as the predicate factual finding supporting enactment of the Code.[1]

Accordingly, the Court concludes that the Town has sufficiently established a substantial governmental interest in ensuring that the adverse effects affiliated with "adult use" businesses do not deteriorate the adjacent residential areas and are restricted in their accessibility to minors. *See Town of Islip,* 73 N.Y.2d at 553, 542 N.Y.S.2d at 143, 540 N.E.2d 215 (government interest is the "eradication of the effects of urban blight and neighborhood deterioration and furtherance of the general underlying purpose of zoning, the en-

hancement of the quality of life for the Town's residents").

**C. Legislation Narrowly Tailored to Achieve the Governmental Interest**

■ The legislation must also be "narrowly tailored to affect only those uses shown to produce the wanted secondary effects." *Id.,* 73 N.Y.2d at 554, 542 N.Y.S.2d at 144, 540 N.E.2d 215. Plaintiff essentially asserts an under-inclusive argument under the banner of an equal protection claim, averring that the legislation at issue singles out adult entertainment establishments while other establishments that cause adverse secondary effects, such as bars, are not regulated by the Code. This argument is unconvincing for a number of reasons. First, as in *Renton,* "[w]e simply have no basis on this record for assuming that [defendant] will not, in the future, amend its ordinance to include other kinds of adult business that [are] shown to produce the same kinds of secondary effects." *Renton,* 475 U.S. at 53, 106 S.Ct. at 931–32. Moreover, it is of no constitutional consequence that other unregulated activities may produce similar secondary effects. As the Supreme Court established fifty years ago, "[i]t is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Railway Express Agency v. New York,* 336 U.S. 106, 110, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949).

Second, as the court in *Town of Islip* indicated in the face of a challenge for failing to regulate all bookstores and theaters in a similar manner, "[t]he ordinance would be invalid, however, if the Town attempted to zone all theaters and bookstores ... out of fear the ordinance would be judged content-based if it did otherwise (although it found only adult bookstores and theaters caused the unwanted secondary effects) because it would sweep more

---

**1.** One practitioner pondered whether "anecdotal evidence will be used in the future to justify an ordinance," because the notion that adult businesses cause adverse secondary ef-

fects is approaching universal acceptance. John M. Armentano, *Adult Entertainment: New York's Zoning Scheme Meets Well Defined Standards,* N.Y.L.J., p. 5 (March 25, 1998).

broadly than necessary to cure the proscribed evil." *Town of Islip*, 73 N.Y.2d at 554, 542 N.Y.S.2d at 144, 540 N.E.2d 215.

More recently, in finding New York City's amended zoning regulation constitutional in the face of a challenge for failing to utilize the least restrictive means possible, the New York Court of Appeals stated, "[b]y preventing adult businesses from locating in potential residential districts while allowing such establishments to locate in manufacturing and commercial districts, the amendments protect only those communities and community institutions that are most vulnerable to their adverse impact." *Stringfellow's*, 91 N.Y.2d at 400, 671 N.Y.S.2d at 416, 694 N.E.2d 407. In a similar posture, the Code's regulation, limited to "Adult Use" businesses only, is narrowly tailored to affect only the unwanted secondary effects directly attributable thereto. In *Schad*, for instance, the Court struck down an ordinance banning all live entertainment because it regulated too much speech without a sufficient evidentiary basis. 452 U.S. at 73, 101 S.Ct. at 2185. The Second Circuit also recently rejected an equal protection claim based on a gender-based classification in *Buzzetti*, because the legislature determined that the secondary effects of adult entertainment beset female, though not male topless entertainment. 140 F.3d at 142.

Accordingly, the Court finds that the Code is narrowly tailored to regulate "adult use" establishments in an attempt to temper unwanted secondary effects, without implicating equal protection concerns.

D. Reasonable Alternative Avenues of Expression

 The Code must also allow for alternative locations within the Town for "Adult Use" businesses, so as to not unreasonably limit alternative avenues of communication. *See Renton*, 475 U.S. at 53, 106 S.Ct. at 932. As applied to the instant action, Defendant may not effectively deny Plaintiff a reasonable opportunity to open

and operate the Crystal Cafe within the Town of Babylon. Although courts have since grappled with the scope and application of the terms "effectively deny" and "reasonable opportunity" in determining what constitutes an adequate alternative, *Renton* made clear that commercial viability is not an appropriate factor in the analysis. *Id.*, 475 U.S. at 54, 106 S.Ct. at 932 ("respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees . . .").

New York courts have found adequate alternatives where ample space exists for adult uses and enforcement of the regulation will not substantially reduce the total number of adult use outlets or significantly reduce accessibility of those outlets to patrons. *Stringfellow's*, 91 N.Y.2d at 402, 671 N.Y.S.2d at 417, 694 N.E.2d 407; *Town of Islip*, 73 N.Y.2d at 555, 542 N.Y.S.2d at 144, 540 N.E.2d 215.

Federal courts have defined the analysis to consider the physical and legal availability of alternative sites along with a determination of whether those sites are part of the actual real estate market. *Stringfellow's*, 91 N.Y.2d at 402, 671 N.Y.S.2d at 417, 694 N.E.2d 407 (analyzing federal court decisions). Factors relevant to this analysis include: (1) accessibility to the general public, (2) surrounding infrastructure, (3) pragmatic likelihood of the space ever becoming available, and (4) whether sites are suitable for some generic commercial enterprise. *Id.*, 91 N.Y.2d at 402, 671 N.Y.S.2d at 418, 694 N.E.2d 407.

The Ninth Circuit has noted that it is "constitutionally irrelevant whether relocation sites located in industrial or manufacturing zones suit the particular needs of an adult business, [however] potential sites must be reasonable relocation sites for some commercial enterprise before they can be considered part of the relevant market." *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1531 (9th Cir. 1993). This has been used to exclude air-

ports, land under the ocean, warehouses, stadiums, swamps and sewage treatment plants from the actual real estate market. *Woodall v. City of El Paso*, 49 F.3d 1120, 1124 (5th Cir.1995); *Topanga Press*, 989 F.2d at 1531. However, whether a site is unavailable because it is presently occupied, leased, or just not for sale, or because the owner would refuse to rent to an adult business, does not enter into the calculus because *Renton* "forecloses inquiry into whether a relocation site is only 'potentially' as opposed to 'actually' available." *Woodall*, 49 F.3d at 1126.

The present record contains little evidence respecting how many alternative sites exist and the parties have essentially admitted that this is an issue of material fact which precludes summary judgment on the matter. (Transcript of Oral Argument (hereinafter "Tr.") at 15, 33.) Plaintiff's counsel, however, apparently did not intend for this issue to present an obstacle to summary adjudication and conceded as much stating:

> Judge, in all candor, I have spoken with Mr. McLaughlin [Plaintiff's Expert], and he is of the opinion that perhaps there may be adequate alternative locations. There may just be. The problem lies in the fact that you have to go through that special exception procedure before you actually get to that. So, rather than to have the Court go through all the additional legwork of evaluating that particular issue, at this point I clearly don't think that it would be appropriate in a motion for summary judgment. I feel that it would be one of the things that are secondary to your analysis.

(Tr. at 42–43.) Notwithstanding Plaintiff's concession on this point, it is still a matter of critical inquiry in this Court's determination of the constitutionality of the legislation. Accordingly, further evidence will have to be provided by Defendant Town of Babylon to prove that reasonable alternative avenues of communication exist.

Defendant Town of Babylon is hereby directed to provide the Court and Plaintiff with legally admissible evidence of the sufficiency of alternative sites within the Town's borders and whether those sites are part of an actual business real estate market. In complying with this directive, the Town should be guided by the parameters discussed in the cases cited herein and should provide the following additional information if available: (1) the number of businesses in operation and identified as adult use upon enactment of the Code on or about December 15, 1987; (2) the number of adult use businesses presently in operation; (3) the number of applications by prospective adult use businesses for Special Exception Use Permits; (4) the number of Public Hearings held to address applications by prospective adult use businesses for Special Exception Use Permits; (5) the number of Special Exception Use Permits issued to adult use businesses; (6) the percentage of the Town's total land area available for adult use businesses; and (7) the percentage of the Town's total land area available for adult use businesses when reduced by land unlikely to be developed for commercial use. Defendant will have 45 days from the date of this Memorandum and Order to prepare such report and serve a copy on Plaintiff and to file the original with the Court. Plaintiff will then have 30 days in which to file a response to Defendant's report with the Court and to serve a copy on Defendant.

## IV. ADEQUATE PROCEDURAL SAFEGUARDS

Assuming, arguendo, sufficient alternative avenues of communication exist, the Court's inquiry is not complete. Plaintiff further asserts that because the legislation regulates First Amendment protected activities, all supplementary permit or licensing requirements must contain adequate procedural safeguards and allow for prompt judicial review.

### 1. Unbridled Discretion

In the context of the First Amendment, it is clearly established that

a regulatory scheme which "places unbridled discretion in the hands of a government official" will be adjudged an unconstitutional prior restraint. *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988). "[A] permit scheme qualifies as a prior restraint because it essentially requires the permittee to obtain the government's permission or approval before engaging in an act of First Amendment protected speech." *Nakatomi Invs., Inc. v. City of Schenectady*, 949 F.Supp. 988, 1002 (N.D.N.Y.1997). One's constitutional freedoms cannot be "contingent upon the uncontrolled will of an official" in charge of granting the required license or permit. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226, 110 S.Ct. 596, 605, 107 L.Ed.2d 603 (1990) (citing *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969) (reversing convictions entered under ordinance that allowed city commissioners to grant or deny parade license permit based on their ideas of "public welfare, peace, safety, health, decency, good order, morals or convenience")).

The regulatory scheme must "set objective standards governing the grant or denial of license applications, in order to ensure that the officials not have the 'power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers.'" *Charette v. Town of Oyster Bay*, 159 F.3d 749, 754 (2d Cir.1998) (quoting *City of Lakewood*, 486 U.S. at 759, 108 S.Ct. at 2145).

■ As the Court in *City of Lakewood* explained, "even if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion." 486 U.S. at 764, 108 S.Ct. at 2147 (emphasis in original). The ordinance at issue in *City of Lakewood* provid-

ed the mayor with the discretion to deny the application for a newsrack permit for, *inter alia*, "such other terms and conditions deemed necessary and reasonable by the Mayor." *Id.* at 769, 108 S.Ct. at 2150. Albeit the speech at issue therein was entitled to plenary First Amendment protection, however, the Court was resolute in requiring the legislative limits to be "made explicit by textual incorporation, binding judicial or administrative construction or well-established practice." *Id.* at 770, 108 S.Ct. at 2151 (citing *Poulos v. New Hampshire*, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953)). Thus, neither requiring the mayor to state the reason for denying a permit, nor the prospect of relatively speedy judicial review could substitute for concrete standards to guide the decisionmaker's discretion, and the ordinance was deemed facially unconstitutional. *Id.* at 771, 73 S.Ct. 760, 108 S.Ct. at 2151. This was in keeping with the Supreme Court's earlier holding in *Shuttlesworth* that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective and definite standards to guide the licensing authority, is unconstitutional." 394 U.S. at 150–51, 89 S.Ct. at 938.

At least three courts located in New York have invalidated special permit procedures—also referred to as conditional use permits—which bestowed too much discretion to local officials in granting permits. In *Nakatomi* the Court held that a permit scheme must contain "narrow, objective and definite standards." 949 F.Supp. at 1003. There, the court did not analyze the specific zoning code at issue—because neither party provided a copy to the court—but it did cite with approval a case which invalidated a permit scheme with general standards for issuance such as "inconsistent" with the neighborhood or "insufficiently buffered" from residences. *Id.* (citing *Dease v. City of Anaheim*, 826 F.Supp. 336, 342 (C.D.Cal.1993)).

In *Town of Islip*, the ordinance contained an identical provision to Babylon's

Code, providing that adult uses shall be allowable in an Industrial I district "only as a special exception by the Board of Appeals after public hearing." 141 A.D.2d at 165, 532 N.Y.S.2d at 793. The court concluded that the permit requirement was violative of the bookstore's First Amendment rights because it would allow "the Zoning Board the right to impose restrictive conditions on the adult-use businesses on the basis of subjective factors which may serve to disguise content censorship." *Id.*, 141 A.D.2d at 166, 532 N.Y.S.2d at 794. The Appellate Division, Second Department, proceeded to sever as unconstitutional the portion of the code section "which conditions the establishment of an adult use business ... 'only as a special exception by the Board of Appeals after public hearing' " and upheld the balance of the ordinance. *Id.*, 141 A.D.2d at 168, 532 N.Y.S.2d at 795. The Town of Islip did not appeal the court's ruling, and therefore the permit procedure was not addressed in the Court of Appeals decision. *Town of Islip*, 73 N.Y.2d at 549, 542 N.Y.S.2d at 140, 540 N.E.2d 215.

■■■ This is not to suggest that a township may never place additional permit restrictions on a particular use of property, however, where such impositions implicate First Amendment rights, the ordinance must set objective standards and guidelines for the zoning board to follow in deciding whether to grant or deny the permit. *See id.*, 141 A.D.2d at 166, 532 N.Y.S.2d at 794.

In *Charette*, the Town of Oyster Bay enacted a permit procedure similar to the case at bar, and although the record was not fully developed precluding the Second Circuit from reaching the merits, the court did observe that "while the Oyster Bay Code lists a number of specific factors that Town officials are to consider in determining whether to issue permits for cabarets, it is indisputable that the Code also requires Town officials to withhold permits on the basis of their views as to health, safety, welfare, comfort, convenience and

order—i.e., broad standards of the type that have been held insufficient to pass First Amendment muster." *Charette*, 159 F.3d at 755.

In *Marcus v. Town of Henrietta*, the court struck down a zoning ordinance requiring application for a special use permit because absent sufficiently narrow, objective and definite standards to guide the governing board, the ordinance "confer[red] broad discretion upon the Town Board, leaving the permit process open to the kind of arbitrary action that is 'inherently inconsistent with a valid time, place and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.' " 207 A.D.2d 1026, 1027, 616 N.Y.S.2d 845, 845 (4th Dep't 1994) (quoting *Heffron v. International Soc'y for Krishna Consciousness*, 452 U.S. 640, 649, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981)).

■■■ In the case at bar, pursuant to Code Section 213–376(A), adult uses businesses shall be allowable in any industrial district only as a special exception by the Board of Appeals after public hearing. Article XXXII of the Code was added on April 8, 1988, and establishes, *inter alia*, the general standards for issuance of a special exception use permit, which includes fourteen findings the Town Board must make, reproduced *supra* herein, and an all encompassing right of the Town Board to impose any additional requirements to assure that the fourteen general standards are met, including, but not limited to, a limit on hours of operation and a surety bond posting requirement. *See* § 213–383(B).

The fourteen findings include both detailed requirements germane to the determination of the suitability of a particular adult use business, and open-ended nebulous requirements which clearly bestow unlimited discretion to the Town Board, leaving open the possibility of content-based discrimination. *See Nakatomi* 949 F.Supp. at 1003 (analyzing similar require-

ments found invalid in *Dease*). This unconstitutional discretion is heightened by the additional provision allowing the Town Board to "impose any additional requirement to assure that the standards ... will be met." § 213–383(B). Accordingly, the Special Exception Use Permit requirement is unconstitutional as applied to First Amendment protected speech.

## 2. Severability

■ Though the special exception use permit requirement, as presently constituted, is invalid as applied to adult use businesses, it may be completely appropriate when applied to businesses which do not involve protected speech. Furthermore, as described in *Town of Islip*, just because "one part of a statute is unconstitutional does not necessarily invalidate the entire act. It is a fundamental rule that an unconstitutional part of a statute may be severed and rejected, while the valid portion may stand." 141 A.D.2d at 166–67, 532 N.Y.S.2d at 794. *See also Barbulean v. City of Newburgh*, 640 N.Y.S.2d 935, 950 (Sup.Ct. Orange County 1995) (invalidating the special use permit requirement in challenge to ordinance brought by adult bookstore owner).

■ "Severability of a local ordinance is a question of state law." *City of Lakewood*, 486 U.S. at 772, 108 S.Ct. at 2152 (citing *Mayflower Farms, Inc. v. Ten Eyck*, 297 U.S. 266, 274, 56 S.Ct. 457, 459, 80 L.Ed. 675 (1936)). The longstanding standard for severance is "whether the Legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected altogether. The answer must be reached pragmatically, by the exercise of good sense and sound judgment, by considering how the statutory rule will function if the knife is laid to the branch instead of at the roots." *People ex rel Alpha Portland Cement Co. v. Knapp*, 230 N.Y. 48, 60, 129 N.E. 202, 207 (1920). Justice Cardozo further elucidated: "Our right to destroy is bounded by the limits of necessity. Our duty is to save unless in saving we pervert." *Id.*, 230 N.Y. at 62–63, 129 N.E. at 208.

■ The trend is to apply severance doctrine liberally in order to save a statute, especially when the law contains a severability clause. *Town of Islip*, 141 A.D.2d at 167, 532 N.Y.S.2d at 794. The presence of such a clause, however, is not dispositive. *See United States v. Jackson*, 390 U.S. 570, 585 n. 27, 88 S.Ct. 1209, 1218 n. 27, 20 L.Ed.2d 138 (1968) (the ultimate determination of severability will rarely turn on the presence or absence of a severability clause).

Courts that have refused to sever a statute typically have found that "the balance of the legislation is incapable of functioning independently [because] the valid and invalid provisions are so intertwined." *National Adver. Co. v. Town of Niagara*, 942 F.2d 145, 148 (2d Cir.1991) (finding sign ordinance unconstitutional and unsuited for severance because dissociating eleven provisions would leave large gaps in the ordinance, notwithstanding the general severance provision); *see also In re New York State Superfund Coalition, Inc.*, 75 N.Y.2d 88, 94, 550 N.Y.S.2d 879, 881, 550 N.E.2d 155 (1989) (judicial excision is inappropriate where the potentially severed section is a core part of, and interwoven inextricably to, the entire regulatory scheme).

■ In the instant action, the Code provision is virtually interchangeable with the ordinance language severed by the Appellate Division in *Town of Islip*, allowing adult use businesses only after obtaining a special exception permit after a public hearing. 141 A.D.2d at 168, 532 N.Y.S.2d at 795. The Islip ordinance contained a severance provision, while the Town of Babylon Code does not, yet, this distinction is of marginal moment.

The Court is extremely averse to picking and parsing from within the special exception use permit requirements the specific findings which should respectively

remain or be removed. As a federal court interpreting a town code, "[t]he interests of federalism and comity dictate conservatism in imposing our interpretive views on state statues." *National Adver.*, 942 F.2d at 151 (citing *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 508, 105 S.Ct. 2794, 2804, 86 L.Ed.2d 394 (1985) (O'Connor, J., concurring)).

Severance apparently comports with the Town's expectations. First, after modeling the Code after the Islip legislation, the Town would likewise desire any invalid portions severed, notwithstanding the absence of a severance provision in the Code. Second, Town's counsel stated at oral argument that he was surprised that the Code did not have a severability provision and that "each section of the Town's Code would be severable.... And should the Court find any particular section to be repugnant to the Constitution, then it would be able to strike each individual section rather than the whole chapter." (Tr. at 40–41.)

Here, as in *Town of Islip*, the simplest and most straight-forward solution is to sever the language "only as a special exception by the Board of Appeals after public hearing" in Code Section 213–376A.

Accordingly, § 213–376(A) of the Code shall now provide: "Adult uses shall only be allowable in an industrial district, subject to the requirements of § 213–378 and consistent with the terms of Article XXXI."

### 3. Prompt Decision and Judicial Review

Although the special exception requirement has been severed, it is still worthwhile to touch upon the constitutional protections accorded prior restraints of free speech as applied to the Code, and Plaintiff's challenges thereto. To further protect against the possibility of censorship, the Supreme Court in *Freedman v. Maryland* adopted three required procedural safeguards: (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court. *FW/PBS, Inc.*, 493 U.S. at 227, 110 S.Ct. at 606 (citing *Freedman v. Maryland*, 380 U.S. 51, 58–60, 85 S.Ct. 734, 738–40, 13 L.Ed.2d 649 (1965)). The Town accurately points out that *Freedman* dealt with a censorship board that directly engaged in the restriction of free speech, and thus is not directly on point. However, the Supreme Court has analyzed *Freedman* in the context presented herein, finding the first two requirements applicable. *FW/PBS, Inc.*, 493 U.S. at 228, 110 S.Ct. at 606. *Freedman* applies when the permit requirement is, in effect, a licensing scheme. When it is not, as in the Second Circuit's analysis of the permit requirement in *Marty's Adult World v. Town of Enfield, Conn.*, 20 F.3d 512 (2d Cir.1994), the procedural safeguards of *Freedman* are inapplicable.

In *Marty's Adult World*, the special use permit requirement was found to be a content-neutral time, place and manner restriction and not a licensing scheme, because, in part, the business could operate elsewhere in the town without obtaining a special use permit. *Marty's Adult World*, 20 F.3d at 515. Here, Babylon's Code required all "Adult Uses" to obtain special exception by the Board of Appeals after Public Hearing, and further limited operation to industrial districts. Accordingly, the Town's Code requiring all adult uses to obtain a special exception permit was, in effect, a licensing scheme, and therefore required a specified brief period of review with expeditious judicial review of that decision.

The Town asserts that the protections provided in New York State Town Law § 267 and Article Seventy–Eight of the New York State Civil Practice Law and Rules Act, (hereinafter "Article 78"), satisfy the dual requirements of *FW/PBS, Inc.*

### A. Permit Application Decided in a Specified Time

With respect to the first requirement, allowing restraint prior to judicial review only for a specified brief period during which the status quo must be maintained, Town Law § 267–a7, entitled "Hearing on appeal," provides, in relevant part, "[t] he board of appeals shall fix a reasonable time for the hearing of the appeal or other matter referred to it and give public notice of such hearing by publication in a paper of general circulation in the town at least five days prior to the date thereof." However expeditiously the Town Board may render a decision, it is not required to do so within a specified time frame.

In *Riley v. National Fed'n of the Blind of N.C., Inc.,* the Supreme Court held that a licensing scheme which failed to provide for definite time limitations within which the licensor must issue the license was constitutionally infirm, because the "delay compel[led] the speaker's silence." 487 U.S. 781, 802, 108 S.Ct. 2667, 2680, 101 L.Ed.2d 669 (1988). Although providing a reasonable time frame to establish a hearing satisfies general due process requirements, it is unclear, and the Court need not decide, whether, in the case of a prior restraint to the extent at issue here, the constitution mandates a decision within a delineated duration.

In *Redner v. Dean,* 29 F.3d 1495 (11th Cir.1994), the Eleventh Circuit held unconstitutional a Florida county ordinance regulating adult entertainment establishments which provided for the grant or denial of a license within forty-five days, or, absent a decision, the applicant could commence operating until the license was denied. *Id.* at 1497. The court found that this "illusory" forty-five day limit "risk[ed] the suppression of protected expression for an indefinite time period ..." *Id.* at 1501. In *11126 Baltimore Boulevard, Inc. v. Prince George's County, Maryland,* the council was required to render a decision on a special permit application within 150 days, a time frame the Fourth Circuit struck as excessively long. 58 F.3d 988, 997–98 (4th Cir.1995); *see also MacDonald v. Safir,* 26 F.Supp.2d 664, 670–76 (S.D.N.Y.1998) (finding no explicit time limits on the Police Department's consideration of parade permit applications and a variant past practice in processing applications, failed to provide constitutionally required explicit standards); *Nichols v. Village of Pelham Manor,* 974 F.Supp. 243, 252 (S.D.N.Y. 1997) (striking down ordinance requiring door-to-door solicitors to first obtain a license from the police, without establishing a time period for the police to render a decision, in violation of *Freedman*).

In *Gasparo v. City of New York,* however, the court upheld the application procedure for a newsstand vending operation requiring the commissioner to "make a prompt written decision." 16 F.Supp.2d 198, 210 (E.D.N.Y.1998). While acknowledging that " 'prompt' does not affix a precise duration to the time period in which a decision may be reviewed, courts are able to determine whether such a standard has been met in a particular case, and a statute's failure to specify precise durational requirements does not necessarily render it unconstitutional." *Id.* (citing *United States v. Thirty–Seven Photographs,* 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) (upholding a criminal forfeiture statue which contained no time limits within which judicial action had to be commenced by reading into the statute the requirement that judicial "proceedings be commenced within 14 days and completed within 60 days of their commencement," and thus satisfying *Freedman's* timeliness requirements)).

Pursuant to Town Code Section 267–a(8), once the Board of Appeals holds a hearing, the decision shall be rendered within sixty-two days after the conduct of such hearing. The Court believes this constitutes a reasonable and definite time period in which to render a decision. *See TK's Video v. Denton County, Tex.,* 24 F.3d 705, 708 (5th Cir.1994) (holding 60 day period to act on license application for

adult businesses imposes no undue burden).

It is important to note that it is not this Court's opinion that an otherwise constitutionally valid special permit procedure providing specific standards and guidelines for the zoning board to follow would necessarily require the Town Board of Appeals to immediately convene a hearing or to reschedule other zoning business to first address a special permit application just because it involves an adult use. The threat to the protected speech at issue is not that the adult use business is delayed in commencing its operations, rather, it is the risk that unfettered discretion will repose in the officials reviewing the permit application, lending itself to content-based suppression of such speech. "Where the licensor has unlimited time within which to issue a license, the risk of arbitrary suppression is as great as the provision of unbridled discretion." *FW/PBS, Inc.*, 493 U.S. at 227, 110 S.Ct. at 605. Though the issue is not presently before the Court, it is unsettled whether an otherwise constitutionally valid special permit procedure enacted by the Town without a specific time limit requiring a hearing to convene, which relied entirely upon the procedural safeguards provided in New York State Town Law § 267–a7, would satisfy the constitutional requirements of *Freedman* and its progeny.

### B. Judicial Review of the Decision

With respect to the second procedural safeguard articulated in *Freedman,* the Town avers that an Article 78 proceeding provides Crystal the necessary prompt judicial review. Pursuant to Town Law § 267–c(1), "[a]ny person ... aggrieved by any decision of the board of appeals ... may apply to the supreme court for review by a proceeding under article seventy-eight of the civil practice law and rules. Such proceeding shall be instituted within thirty days after the filing of a decision of the board in the office of the town clerk."

This issue, however, is not readily resolved and invades an area of law devoid of clarity. Neither the Supreme Court nor the Second Circuit have provided explicit guidance. Judge Ross provides a detailed description in *Gasparo* of the various arguments advanced and the rationales relied on by those circuits which have specifically addressed whether an action in mandamus satisfies the prompt judicial review requirement of FW/PBS, Inc., Gasparo, 16 F.Supp.2d at 210–14.

Recently, the Ninth Circuit Court of Appeals in *Baby Tam & Co., Inc. v. City of Las Vegas* also reviewed the circuit split while deciding that the state provision for mandamus relief does not satisfy the requirement of prompt judicial review. 154 F.3d 1097, 1101 (9th Cir.1998). The *Baby Tam* court reversed a district court's denial of injunctive relief in plaintiff's First Amendment facial challenge to a zoning ordinance which proscribed the issuance of a license to operate an adult bookstore within a specific commercial zone. *Id.* at 1102. Because the mandamus procedure in Nevada affords the reviewing court the discretion to make the writ returnable at any time, the Ninth Circuit held it did not provide the required prompt judicial review. *Id.* at 1101. This position is shared by the Fourth and Sixth Circuits which require a prompt decision on the merits, *id.* (citing *11126 Baltimore Blvd. v. Prince Georges County, Maryland,* 58 F.3d 988 (4th Cir.1995), & *East Brooks Books, Inc. v. City of Memphis,* 48 F.3d 220, 225 (6th Cir.1995)), while the "Fifth and Seventh Circuits have held that prompt access to judicial review is sufficient, even if there is no time frame for a hearing or a decision on the merits." *Id.* (citing *TK's Video, Inc.,* 24 F.3d at 709, & *Graff v. City of Chicago,* 9 F.3d 1309, 1324–25 (7th Cir. 1993) (en banc)). *Gasparo's* analysis includes the First Circuit in this latter group on the basis of *Jews for Jesus v. Massachusetts Bay Trans. Auth.,* 984 F.2d 1319, 1327 (1st Cir.1993) (finding prompt judicial review was met where guidelines required solicitor to obtain prior permission and a

denial may be appealed via a subsequent hearing). *Gasparo,* 16 F.Supp.2d at 212.

The Eleventh Circuit decided the issue without revealing if more than mere access to judicial review is required, finding that an exhaustion of administrative remedies requirement constituted a denial of prompt judicial review. *Redner,* 29 F.3d at 1501–02. *Gasparo* ultimately concluded that "recourse to Article 78 here likely constitutes a sufficient procedural safeguard" . . . and plaintiffs failed to establish a sufficient likelihood of success on the merits to justify preliminary injunctive relief. *Gasparo,* 16 F.Supp.2d at 213–14.

In this unsettled area of law, legislatures are wise follow the lead of New York City and bypass the perplexities of prior restraint by establishing all the parameters for operating adult use businesses in the zoning code proper, without requiring special permit procedures. *See Buzzetti,* 140 F.3d at 136–37; *Stringfellow's,* 91 N.Y.2d at 392–94, 671 N.Y.S.2d at 411–12, 694 N.E.2d 407.

## V. EQUITABLE ESTOPPEL/LACHES AND INVERSE CONDEMNATION

 Plaintiff also asserts an equitable estoppel argument which amounts to an unjustified reliance that the Code would not change in a manner adversely affecting Plaintiff's business. Although there may or may not have been an establishment at Crystal's location which provided adult entertainment prior to the adoption of the Code, it is undisputed that this Plaintiff did not incorporate until November of 1994, some six months before the first notice was sent by the Town, and some seven years after the Code at issue was enacted. (Tr. at 40.) In addition, the Code provides an amortization schedule allowing owners to maintain legal nonconforming uses for a period of time after enactment based upon their respective amounts of capital investment. Code § 213–381. Codes providing for compliance in accordance with an amortization schedule have been repeatedly sustained by New York courts when addressing "[t]he intractable problem of eliminating nonconforming uses." *Town of Islip,* 73 N.Y.2d at 560–61, 542 N.Y.S.2d at 148, 540 N.E.2d 215 (and cases cited therein). Thus, Plaintiff was given the opportunity to make the necessary arrangements to comply with the Code. Any additional investment made in the business after enactment of the Code was made in derogation of the Code, not in reliance on the status quo ante.

 The Code's amortization provision of § 213–381 also envelops and eliminates Plaintiff's adverse condemnation "takings" claim. There are two categories of zoning regulations that can constitute a taking that require just compensation: (1) where the regulation involves a physical invasion of the owner's property; or (2) where the regulation deprives the owner of all economically beneficial uses of the property. *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). Plaintiff has made no assertion of either physical invasion or loss of all economic use, only that his particular business will suffer.

Moreover, the Code provided for the gradual termination of legal nonconforming uses, effectively precluding such a claim. *See Stringfellow's,* 91 N.Y.2d at 405, 671 N.Y.S.2d at 409, 694 N.E.2d 407 (plaintiffs' claims that the amendments' enforcement will lead to an unconstitutional taking because substantial investments will be lost if forced to relocate are unpersuasive, and "[h]aving failed to seek relief under [the amortization] provision, plaintiffs are not now in a position to complain that their constitutional due process rights have been violated").

All other challenges to the Code presented by Plaintiff are without merit and will not be discussed herein.

## CONCLUSION

The parties cross-motions for summary judgment are denied without prejudice at

this juncture and the status quo is maintained. In accordance with this Memorandum and Order, the Defendant will file the required documents with the Court within 45 days, and the Plaintiff will have an opportunity to respond within 30 days thereafter.

Although it is presently premature to entirely rule on the constitutionality of the Code section, it is conclusive that the special exception use permit requirement of Article XXXI, Code Section 213–376A, is an unconstitutional prior restraint of Plaintiff's First Amendment protected speech rights, and accordingly, is hereby severed from the balance of Article XXXI as modified within the body of this Memorandum and Order.

SO ORDERED.