T & A'S, INC., Plaintiff,

v.

TOWN BOARD OF THE TOWN OF RAMAPO and Herbert Reisman, in his capacity as Ramapo Town Supervisor, Defendants.

No. 97 Civ.1907 (BDP).

United States District Court,
S.D. New York.

Aug. 8, 2000.

Rory Kiernan P. Clark, Dorfman Lynch & Knoebel, Nyack, NY, for plaintiffs.

Michael Klein, Suffern, NY, for defendant New York State.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARRINGTON D. PARKER, Jr., District Judge.

This case challenges the validity of an ordinance enacted by the Town of Ramapo regulating the location of adult entertainment establishments in Monsey, a village in Ramapo. Plaintiff, a topless bar in Monsey, seeks a declaratory judgment that the ordinance unconstitutionally abridges freedom of expression and an injunction barring its enforcement. This Court concludes that the ordinance violates plaintiff's right to freedom of expression. The ordinance is devoid of sufficiently objective criteria establishing where adult entertainment might be permissible. In addition the ordinance, by failing to provide reasonable alternative avenues of expression, as a practical matter, bars adult entertainment from Ramapo. Following are this Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

Plaintiff T & A's, Inc. ("T & A's") commenced this action on March 18, 1997 against defendants the Town Board of the Town of Ramapo (the "Town") and Town Supervisor Herbert Reisman ("Reisman") pursuant to 42 U.S.C. §§ 1983, 1985 and 1988 alleging that a zoning ordinance enacted by the Town, known as Local Law No. 3–1997 (the "Local Law" or "ordi-

nance"), violates its First Amendment right to freedom of expression. The Local Law mandates that no adult entertainment establishment may be located within 1,000 feet of a school or church, within 500 feet of a day care center or residential district, or within 500 feet of another adult business. Under the ordinance, T & A's, which is located 800 feet from a school, is required to relocate. A Consent Order was issued by this Court on June 17, 1997 enjoining the Town from enforcing the challenged zoning amendments during the pendency of this action and the case proceeded in December 1999 to trial on the merits.

## I. T & A's

T & A's, Ramapo's only existing adult establishment, opened in 1990 at 78 Route 59 in Monsey, an unincorporated hamlet. Located about 22 miles from New York City, Monsey was founded by Orthodox Jewish families in the 1970s and its population is largely Hasidic. *See LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 417 (2d Cir.1995); *Hudson Transit Lines, Inc. v. United States*, 562 F.2d 174, 176 (2d Cir. 1977). T & A's acquired its lease from a business called "The Lamplighter," a former topless bar which had occupied the premises for over twenty years. Approximately five years remained on the lease at the time T & A's acquired it from The Lamplighter. The building has changed ownership since that time and T & A's renegotiated a lease with the current landlord which extends to 2004.

T & A's is located in a heavily commercial area and is easily accessible from the New York State Thruway, the Palisades Parkway, the Garden State Parkway and Interstate 287. T & A's draws patrons from Westchester, Dutchess, Orange and Rockland Counties in New York as well as Bergen County in New Jersey. The entertainment at the establishment, which has a 50 seat capacity, consists of nude and semi-nude dramatic dancing by women performing for men on stage accompanied by music, special lighting and effects, such as smoke. In accordance with New York law prohibiting the serving of alcohol in establishments that provide nude dancing, T & A's does not serve alcohol. Except for limited vending machine service, T & A's does not serve food.

## II. Legislative History of Local Law No. 3–1997

Beginning in the early 1990s, Town Supervisor Reisman had several meetings with representatives of the Hasidic and Orthodox Jewish communities of Monsey, including several Rabbis, who complained about the entertainment at T & A's and the patrons that the business attracted. Specifically, the Rabbis disapproved of naked women performing for men, considering such entertainment immoral and degrading to women, and complained that T & A's was an inappropriate distraction to the men in their community. No members of the Monsey community however, presented evidence to Reisman of any concrete negative effects caused by T & A's.

In October of 1996, following the New York Supreme Court's decision in *Stringfellow's of New York, Ltd. v. City of New York*, 171 Misc.2d 376, 653 N.Y.S.2d 801 (1996) sustaining the validity of restrictions imposed by New York City on adult entertainment establishments, several Rabbis arranged a meeting with Reisman at which he was finally persuaded, in part by the religious community, to propose an adult use law, based upon the *Stringfellow's* decision. The legislation was specifically addressed at T & A's. Town Board Member David Stein testified that the 1000 foot buffer zone for schools and houses of worship was inserted into the law because there is a Jewish school approximately 800 feet away from T & A's.

The Town of Ramapo did not conduct any studies prior to the enactment of the Local Law regarding any negative or deleterious impact of adult businesses on the Town and this topic was not a subject of the Town's proof at trial. Rather, Town

officials relied upon an adult entertainment use survey study report prepared by Manuel S. Emmanuel Assocs. Inc., Community Planning and Development Consultants for the Village of Nyack, dated November 26, 1991, and a report by the same planning and development consultants for the Village of Spring Valley dated, March 31, 1996.

### III. Local Law No. 3–1997

The zoning law was adopted by the Town Board on February 12, 1997 as Local law No. 3–1997, following public hearings held on December 11, 1996 and January 22, 1997. The Local Law contains four sections. Section 1 set forth the ordinance's legislative intent, declaring it an effort to prevent the "significant adverse impact [of adult businesses] on the surrounding community." Section 2 amended Section 376–181 of the Ramapo Zoning Code by adding definitions of "Adult Establishment."[1] Section 3 amended the Table of General Use requirements of the Ramapo Zoning Code by adding adult establishments to its use table. Section 4 amended Article XII of the Ramapo Zoning Law by adding section "376–1217," which permits adult establishments to exist in the Commercial Shopping ("CS") district subject to specific buffer zones and "conditional use" and special permit standards" contained in Articles XI and XII of the Ramapo Code. Section 4 contains the following specific restrictions on adult businesses:

A. *Adult Establishments* are permitted in the CS District subject to the following requirements:

1. No more than one adult establishment shall be located on any lot.

2. No adult establishment shall be established closer than 500 feet from the lot line of any other adult establishment.

3. No adult establishment shall be established closer than 1,000 feet from the lot line of any House of Worship, school, or 500 feet from the lot line of any residence district or day care center.

4. An adult establishment must comply with the parking requirements for restaurants as set forth in the Zoning Law in a CS District.

Local Law No. 3–1997, § 4. Lastly, Section 4(B) required existing adult businesses that do not comply with the local law to relocate within one year from the date of the amendment. Businesses may appeal to the Town Zoning Board of Appeals for an extended relocation period if an applicant can prove investment-backed expectations pursuant to Section 4(C).

The Table of General Use Requirements Part II, titled "Non-residential districts, CS District § 376–31," in Column C lists 15 uses which are conditional uses subject to the Town Planning Board's approval pursuant to the conditions set forth in the amendments as well as the requirements contained in Articles XI and XII of the Ramapo Code. The terms of the amendments add adult establishments as number 16 on this list. Each of the original 15 uses designated in Column C of the table of general use requirements for the CS District are assigned a Use Group identification.

The definitions contained in Section 2 of the ordinance define three types of adult establishments: an adult bookstore, an adult eating or drinking establishment and an adult theater. However, the ordinance fails to designate a use group classification for any of these adult uses. Potentially similar uses which are identified in the table of general use requirements are res-

---

1. Local Law No. 3–1997, Section 2 states in part:

An "Adult Establishment" is a commercial establishment where a "substantial portion" of the establishment includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof, . . . .

taurants and taverns (use group B) and theaters (use group I). Each of the uses contained in Column B of the table of general use requirements in the CS zone are as-of-right uses, while the uses identified in Column C are conditional and special permit uses subject to approval by Town planners. Thus, an applicant for an adult use could not determine whether the application was for an as-of-right use or whether it was subject to the discretion of the Planning Board.

## IV. Planning Board Discretion

Article XI of the Code sets forth the procedure for obtaining conditional use approval from the Ramapo Planning Board. Article XII lays out the substantive requirements to obtain conditional use approval and delegates to the Planning Board the discretion to grant, deny, restrict or condition such approval. Article XII, Section 376–120 is entitled "General Conditions" and grants the Planning Board the authority to "adopt additional rules and regulations" pursuant to other terms of the Local Law.

Article XII, Section 376–120 allows that in granting or denying conditional use approval, the Planning Board has discretion to determine if the proposed use is:

A. ... in harmony with the appropriate and orderly development of the district in which it is proposed to be situated and not be detrimental to the site or adjacent properties....

B. ... will not be "hazardous."

C. ... will not hinder or discourage the development and use of adjacent land and buildings.

. . . .

F. ... a time limitation may be imposed.

G. In addition ... the approving Board may, as a condition of approval of any such use, establish any other additional standards, conditions and requirements, including a limitation on hours of operation, as it may deem necessary or appropriate to promote the public health, safety and welfare and to otherwise implement the intent of this chapter.

Thus, in addition to satisfying the buffer zone requirements in Section 4, an applicant seeking to operate an adult entertainment facility must also obtain conditional approval from the Planning Board which has extensive discretionary authority under the Code.

### A. Use Groups

As noted above, adult businesses are not assigned to a Use Group under the new ordinance. As a consequence the Town, at trial, was unable to demonstrate how it classified T & A's, or what criteria T & A's would have to satisfy to relocate in Ramapo.

The use group designation is necessary to determine the various requirements for particular uses, such as the minimum lot area and width, road frontage and setback requirements. For example, if an adult use were categorized under use group "B," as are taverns, restaurants and bookstores, the minimum lot area for such an establishment would be 20,000 square feet, the minimum lot width would be 100 feet, the minimum street frontage would be 100 feet, the front setback requirement would be 35 feet and the rear setback requirement would be 25 feet. Alternatively, if an adult establishment was considered an adult "theater," classified as use group "I," the minimum lot area requirement would be 2 acres (87,120 square feet), the minimum lot width 300 feet, the minimum street frontage 200 feet and front and rear setback requirements of 35 feet each. Thus, the use group assigned to a particular establishment will dramatically affect the availability of alternative sites for T & A's.

It is the responsibility of Brian Brophy

("Brophy"),[2] the Town building inspector, to determine what a particular use is; for example, whether an establishment is a "restaurant," "tavern," or "theater." However, Brophy testified at trial that he did not know how T & A's, which serves food only from vending machines and does not serve alcohol, should be classified. Defendant's planning expert David Stolman ("Stolman") testified that in preparing his report identifying alternative sites for T & A's, he only considered the dimensions applicable to restaurants, taverns and bookstores, which are in Use Group B. Stolman explained that his assignment was "to determine what sites are eligible for adult use establishments," not "to determine which sites are available for specific kinds of adult use establishments. So book stores and uses that can also be categorized as a restaurant or tavern with an adult aspect to it, they can locate on 20,000 foot square lots." Tr. 240. Stolman testified that had he identified potential locations for an adult theater under Use Group I, the results would have been much different.

In addition, Brophy's testimony established that after the law was passed, T & A's Certificate of Occupancy/Use ("CO"), which categorized T & A's as an "adult establishment" was no longer valid under the new law because it did not provide for a use defined as an adult establishment. On September 12, 1997, he changed the use of T & A's to "restaurant and bar with . . . accessory use of live entertainment."

These designations are complicated by the fact that T & A's could also be characterized as a theater. Section 2(c)(2) and

Section 2(d) of the Local Law define an "adult theater" as:

> . . . . [A] theater which regularly features one or more of the following:
>
> (1) files, motion pictures, video cassettes, slides or similar photographic reproductions characterized by an emphasis on the depiction or description of "specified sexual activities" or "specified anatomical areas," or
>
> (2) live performances characterized by an emphasis on "specified anatomical areas" or "specified sexual activities" and which is not customarily open to the general public during such features because it excludes minors by reason of age.[3]

The Town's Table of General Use Requirements and Table of Bulk Requirements assigns theaters to the Use Group I Bulk requirements, including a 2 acre lot-size. The significance of this confusion is that adult entertainment applicants are left to guess about what use group criteria apply. This procedural ambiguity virtually insures that the applicants will not have the benefit of objective criteria and that, under Section 376–120, the Planning Board's discretion to approve or deny applications is unbridled.

## V. Alternative Available Sites

One of the most contested issues at trial was the number of potential alternative sites available under the new law for T & A's and other adult businesses wishing to operate in the Town. Ramapo encompasses 31,040 acres. Though Ramapo contains land which is zoned for industrial, professional and other nonresidential uses, the

---

2. Brophy's official title is Director of Building, Planning and Zoning for the Town.

3. Section (2)(d) defines "specified sexual activities" as:
> (i) human genitals in a state of sexual stimulation or arousal; (ii) actual or simulated acts of human masturbation, sexual intercourse or sodomy; or (iii) fondling or other erotic touching of human genitals, pubic region, buttock, or anus or female breast;

Section (2)(d) defines "specified anatomical areas" as
> (i) less than completely and opaquely concealed: (a) human genitals, pubic region, (b) human buttock, anus or (c) female breasts below a point immediately above the top of the areola; or (ii) human male genitals in a discernible turgid state, even if completely and opaquely concealed.

Town limited adult uses to the CS zone only. The CS zone encompasses 2.1% of the developable land in the Town. The buffer zones contained in Section 4 of the ordinance, as well as the additional zoning code requirements imposed by Section 3 of the ordinance and the "conditional use" requirements and standards which may be further imposed by the Town pursuant to Articles XI and XII of the Town Code reduce the land potentially available for adult uses to only .6%. The actual amount of land available may be even less because the property and portions of property initially identified by the Town are not necessarily available for adult uses. The Town offered no evidence to dispute these percentages, nor did the Town introduce any material, persuasive evidence regarding the percentages of land available in the Town for adult uses under the challenged ordinance.

The Town initially presented evidence that there were nine[4] potential sites available to adult businesses under the law, while plaintiffs presented evidence demonstrating that there were, at best, only two. At the heart of this dispute was disagreement over the proper methodology to be used in measuring buffers between adult uses and the sensitive uses, i.e., schools, churches and residences, identified in Section 4 of the challenged ordinance. Plaintiff argued that the proper method was a "lot-line to lot-line" measurement, while defendants argued that the buffer zone should be measured from the actual building location of a proposed adult use to the lot line of the sensitive use.

William Youngblood, a professional surveyor and engineer who has represented applicants before the Town of Ramapo Zoning and Planning Boards for more than 31 years, testified for the plaintiff that,

generally, Ramapo uses a lot-line to lot-line measurement. In addition, Section 4(A)(3) of the ordinance states "No adult establishment shall be established closer than 1,000 feet from the *lot line* of any House of Worship ... or 500 feet from the *lot-line* of any residence district or day care center." (emphasis added). In addition, Code Section 376–23C states that lots may not be bisected to accommodate a specific use unless the entire lot complies with the zoning code use requirements. The Court credits Youngblood's testimony that a lot-line to lot-line measurement is the correct methodology.

Plaintiff established that most of the potentially available alternative sites identified by the Town were, in fact, not available. Stolman's report shows potential sites for adult businesses in three different parts of the Town's CS zone, identified as Study Area 1 (lots 21E, 26A2B and 26A3A), Study Area 2 (lots 13F1, 13F2A2, 13D2A1E, 7B1A1A4 and 7B1A2A) and Study Area 3 (lot 13J) on the map. Three of the eight lots and portions of lots are located on Route 59 in Study Area 1. Two whole lots are located on Route 202 and Route 17—lot 13D2A1E in Study area 2 and 11J in Study Area 3, respectively.

Using lot-line to lot-line measurements, none of the lots identified by Stolman in Study Area 1 are wholly complying lots, but are rather portions of lots which appear technically to comply with the buffer requirements of Section 4 of the challenged ordinance. As for concurrent uses, in Study Area 1 only one adult establishment could exist in this area since Section 4 of the challenged ordinance requires a "lot-line to lot-line" measurement methodology in determining the buffer zone between uses.[5] Plaintiff established at trial

---

4. Stolman presented a map initially identifying nine potential locations in the Town where an adult use could theoretically exist, but reduced that number to eight potential sites because one of the sites (lot 7B1A2A in Study Area 2) did not comply with the bulk requirements of Use Group B.

5. Though Section 4(A)(2) of Local Law 3–1997 requires an adult establishment to be 500 feet from the lot line of another adult establishment, the measurement must be made in both directions resulting in a lot line to lot line measurement rather than an "establishment" to lot-line measurement.

that two of the lots in Study Area 1—26A2B and 21E—were both less than 500 feet away from the third lot, 26A3A, making it impossible for there to be more than one adult use in that Area. In addition, plaintiff demonstrated that portions of lot 21E are within 1,000 feet of a place of worship, Congregation Karlin Stolin.

In Study Area 2, which identifies four potential adult use locations on Route 202, only two could be used concurrently. Lastly, Study Area 3, (Route 17), identifies one lot, 11J. Therefore, under the most favorable scenario to the Town, four concurrent adult uses could exist in the Town if they were categorized as Use Group B (and assuming they obtained conditional use approval from the Planning Board).

If an adult use is classified as a "theater" imposing the larger bulk requirements of Use Group I, only four sites (two in Study Area 1 and two in Study Area 2) in the entire Town meet those requirements. None of these are whole lots, however. Therefore, under the "lot-line to lot-line" methodology and the requirements of Code Section 376–23C, no adult theaters could exist under the terms of the Ramapo Code as it currently applies.

With respect to concurrent uses, if the lot-line method were not used, two adult theaters appear to be able to co-exist in the Town of Ramapo (one in Study Area 1 and one in Study Area 2). However, one lot would be eliminated because it does not comply with the 300 foot width requirement of the table of bulk requirements for Use Group I. Additionally, Defendants' expert could not demonstrate whether that lot satisfied the setback requirements of the Ramapo bulk table. As for Lot 13F1, Defendants' expert could not identify where the actual structures on that lot were and whether they were actually inside the shaded portion of Study Area 2 or whether this was required parking for the already existing shopping center, and thus whether the structures on that lot actually complied with the challenged local law, let alone the table of bulk requirements.

Plaintiff's planning expert, Roger DeNiscia, testified that Lot 13F1 in Study Area 2 contained an "L-shaped" shopping center, where only the required parking lot was contained in the shaded portion and not the buildings, indicating that this lot also does not comply.

Defendants offered no evidence regarding Lot 13F2A2 except to state that it was a restaurant called "Taste of Distinction". Assuming "Taste of Distinction" complied with all of the bulk and use requirements, this is the only potential location site existing in the Town where an adult theater could technically comply with the Ramapo Zoning Code.

An adult establishment, under the challenged ordinance must also comply with the parking requirements of a restaurant in the CS zone, regardless of its type, which is one parking space per 11 seats. Defendants offered no evidence that this requirement would be met on any of the lots or portions of lots identified by the Town.

With respect to potential sites for the location of an adult restaurant, bar or bookstore (Use Group B classification), lot 13D2A1E in Study Area 2 was identified as a gas station and Lot 11J in Study Area 3 was shown to be subject to a restrictive covenant limiting its use to retail sales, and more importantly, requiring any successive owners or lessees of the premises to hold the Town and its agents harmless from liability due to that lot's location in a flood zone. These two lots, Lot 13D2A1E and Lot 11J, are the only self-contained lots that even arguably comply with the Town's zoning code. It is highly probable, however, that neither of these lots are suitable sites because of the restrictions on 11J and the fact that Lot 13D2A1E contains underground oil storage tanks exposing new owners and occupiers to unreasonable risks of liability.

In sum, the proof at trial showed that the ordinance provided practically no suitable locations for adult entertainment. T

& A's proved at trial that the CS zone in the Town of Ramapo to which adult businesses have been consigned in its entirety only encompasses 2.1% of the land available in Ramapo.ˈ Additionally, the Town initially identified nine sites available to adult uses, encompassing .6% of the land. One site (lot 7B1A2A) was eliminated by the Town's own expert because it failed to comply with the bulk requirements. Lot 13F1, contrary to Ramapo's contentions, is not available because the alleged complying portion contains a required parking lot. Lot 13D2A1E contains underground gasoline tanks and, therefore, is likely not a reasonable site because of the potential environmental liability. Lastly, Lot 11J, which is subject to restrictive covenants, must also be excluded as an unreasonable burden and risk. The total area of these four sites is 469,740 square feet deducted from the initial nine lots totaling 1,039,329 square feet, thus almost cutting in half the .6% to approximately .35%. And, this figure is suspect because it is based upon the most favorable interpretation of the alternative sites available in that it is based on a classification of adult businesses like T & A's as Use Group B.

### CONCLUSIONS OF LAW

Plaintiff asserts that Local Law No. 3–1997 is unconstitutional for several reasons, the principle ones being: (1) that the predominant purpose of the law is to regulate the content of the speech and expression exhibited at T & A's which constituents in the Town find objectionable; (2) the law is not aimed at preventing secondary negative affects associated with adult uses but, rather, was specifically drafted to force T & A's out of a predominantly Orthodox and Hasidic Jewish community; (3) the law only permits adult uses as conditional uses and provides government officials with unbridled discretion to approve, deny, restrict or condition such uses, thereby imposing an unlawful prior restraint; and (4) the Town failed to meet its burden of showing that reasonable alternative avenues of expression exist within the Town under its Zoning Code as amended by the law. Because this Court finds the law unconstitutional for failing reasonably to establish where adult uses are permissible and for failing to provide reasonable alternative avenues of expression, we will not address all of plaintiff's arguments and only briefly address certain ones.

### I First Amendment Principles

■ Nude dancing performed as entertainment, as long as it is not obscene, is expressive conduct protected by the First Amendment. *Charette v. Town of Oyster Bay,* 159 F.3d 749, 753 (2d Cir.1998) (citing *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 565–66, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion)); *id.* at 581, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (Souter, J., concurring); *id.* at 587, 592–93, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (White, J., dissenting); *LaTrieste Restaurant & Cabaret Inc. v. Village of Port Chester,* 40 F.3d 587, 590–91, 592 (2d Cir. 1994) (treating topless dancing as First Amendment activity for purposes of selective enforcement challenge under the Equal Protection Clause); *Redner v. Dean,* 29 F.3d 1495, 1499 (11th Cir.1994), *cert. denied,* 514 U.S. 1066, 115 S.Ct. 1697, 131 L.Ed.2d 560 (1995).

■ The Supreme Court has instructed, however, that different types of First Amendment expression are not all entitled to the same level of constitutional protection. *See United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968) (all symbolic speech is not entitled to First Amendment protection). Specifically, nude dancing and erotic materials are not accorded the full spectrum of First Amendment protection. *801 Conklin Street Ltd. v. Town of Babylon,* 38 F.Supp.2d 228, 235–36 (E.D.N.Y.1999).

■ Because, however, the entertainment offered by T & A's is protected speech, the Town may not impose regulations based on the content of that expression. Municipal "regulations enacted for

the purpose of restraining speech on the basis of its content presumptively violate the First Amendment." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Charette*, 159 F.3d at 754. On the other hand, so-called "content-neutral" time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication. *Renton*, 475 U.S. at 47, 106 S.Ct. 925, 89 L.Ed.2d 29; *Charette*, 159 F.3d at 754.

■ Because the Town's zoning ordinance is designed to combat the undesirable secondary effects of adult businesses, it is reviewed under the standards applicable to "content-neutral" time, place, and manner regulations. *Renton*, 475 U.S. at 49, 106 S.Ct. 925, 89 L.Ed.2d 29 (footnote omitted) (explaining *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)). The appropriate inquiry in such cases is "whether the [municipal] ordinance is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication." *Renton*, 475 U.S. at 50, 106 S.Ct. 925, 89 L.Ed.2d 29; *see Marty's Adult World of Enfield, Inc. v. Town of Enfield*, 20 F.3d 512, 515 (2d Cir.1994) (First Amendment did not invalidate zoning regulations that, for substantial governmental reasons, required a permit for the operation of a viewing-booth business in certain districts, but allowed operation of the business in other parts of the town without a permit).

■ This Court finds that, apart from other deficiencies rendering it invalid, Lo-

cal Law No. 3–1997 is a content-neutral, time, place and manner regulation similar to those upheld by Courts in this and other districts. *See, e.g., Hickerson v. City of New York*, 146 F.3d 99 (2d Cir. 1998) (upholding zoning ordinance which prohibits adult establishments from locating within 500 feet of any school, day care center or house of worship, nor within 500 feet of residential areas); *Buzzetti v. City of New York*, 140 F.3d 134, (2d Cir.1998) (same); *801 Conklin Street Ltd. v. Town of Babylon*, 38 F.Supp.2d 228 (E.D.N.Y. 1999) (upholding portion of ordinance prohibiting adult uses from locating within a 500 foot radius of residential areas, a 500 foot radius of any school, church, or other place of religious worship, park, playground or playing field or locating within a one-half mile radius of another adult use); *Diamond v. City of Taft*, 29 F.Supp.2d 633 (E.D.Ca.1998) (upholding ordinance that prohibited the location of adult entertainment businesses within 1000 feet of residential property, any other adult entertainment business, any public or duly licensed private school or college, or within 500 feet of any park or public playground, public library, church or other religious facility); *S & G News, Inc. v. City of Southgate*, 638 F.Supp. 1060 (E.D.Mich.1986) (upholding municipal zoning ordinance requiring that adult book stores and movie theaters be located more than 1,000 feet of another or within 500 feet of residential dwelling); *Stringfellow's v. City of New York*, 91 N.Y.2d 382, 671 N.Y.S.2d 406, 694 N.E.2d 407 (1998). Here it is clear that the ordinance's primary purpose is to prevent the negative secondary effects of adult businesses experienced by cities across the country.[6]

---

6. The legislative intent of Local Law No. 3 appears in Section 1 and states in part:

The unrestrained proliferation of [adult] businesses is inconsistent with existing and future development for the Town of Ramapo in that they often result in influences on the community which increase the crime rate and undermine the economic, moral, and social welfare of the community. The deleterious effects of these businesses change the economic, social and moral character of the existing community and adversely affect existing businesses and community and family life;

[I]t is recognized that special regulation is necessary in order to prevent the unrestricted proliferation of such businesses and to ensure that those effects will not adversely affect the health, safety and economic well-being of the community;

■ The fact that the Town itself had not felt such effects and did not conduct its own study on the adverse impact of adult businesses does not invalidate the ordinance. The negative secondary effects of adult businesses are, at this point in time, well documented phenomena. *See, e.g., Buzzetti v. City of New York*, 140 F.3d at 135–36; *Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102, 1104 (9th Cir. 1988); *Stringfellow's v. City of New York*, 91 N.Y.2d at 391, 398–99, 671 N.Y.S.2d 406, 694 N.E.2d 407 (discussing *inter alia* 1984 study by city of Indianapolis and 1997 study by City of Los Angeles). In passing the ordinance, the Town was entitled to rely on studies conducted by the Village of Nyack and the Village of Spring Valley. As the Supreme Court stated in *Renton:*

> The First Amendment does not require a city, before enacting an [adult establishment] ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

475 U.S. at 51–52, 106 S.Ct. at 931; *see also S & G News*, 638 F.Supp. at 1066 ("[A] city need not conduct its own independent study or gather its own evidence on the effect of adult uses on urban neighborhoods."); *801 Conklin Street*, 38 F.Supp.2d at 239 (town did not have to conduct its own study of negative secondary effects because "local legislative bodies can take notice of or assume matters of common knowledge or experience").

"Courts in this circuit have approved zoning ordinances enacted to address adverse secondary effects of adult uses upon a showing of even slight legislative predicate and in large measure reliant on the experiences and studies of other communities." *801 Conklin Street*, 38 F.Supp.2d at 239–40; *see also, e.g., Hickerson v. City of New York*, 146 F.3d 99, 105 n. 4 (2d Cir. 1998) (finding report indicated that "the negative perception of adult enterprises held by the business community and the public itself results in disinvestment, with the concomitant deterioration in the social and economic well-being of the surrounding area"); *Tri–State Video Corp. v. Town of Stephentown*, No. 97–CV–965, 1998 WL 72331, at *7 (N.D.N.Y. Feb.13, 1998) (finding municipality was entitled to rely on the experiences of other cities in enacting the ordinance even though it had not experienced the same negative effects as the municipality it based its research upon); *O'Malley v. City of Syracuse*, 813 F.Supp. 133, 146 (N.D.N.Y.1993) (concluding the city need not make an independent finding that stripper establishments will have harmful secondary effects on the surrounding neighborhoods but could rely upon the experiences of other municipalities).

The ordinance was passed to further the substantial governmental interest of preserving the quality of urban life and preventing the deleterious side effects associated with adult uses, an interest " 'entitled to high respect' ". *Renton*, 475 U.S. at 50, 106 S.Ct. at 930 (quoting *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 71, 96 S.Ct. 2440, 2453, 49 L.Ed.2d 310 (1976)); *see also S & G News*, 638 F.Supp. at 1066. Though there is no evidence before this Court that the town had experienced negative side effects, no municipality should be required to wait until the quality of life declines to attempt to protect and preserve its community.

Next, this Court rejects plaintiff's contention that the ordinance is unconstitutional because legislators were unduly influenced by leaders of the Orthodox and Hasidic communities who objected to the content of the entertainment offered at T & A's. Specifically, plaintiff argues that Town Supervisor Reisman, who proposed the law, and Town Councilman Stein, were heavily lobbied by Orthodox and Hasidic leaders, suggesting that the legislation is content-based.

■ But residents of the community had every right to express their views and

preferences to local legislators who had an obligation to hear and consider them. In any event, plaintiff's "reliance on isolated comments from [legislators and Town officials] as evidence of an alleged improper motive to eradicate this form of expression is unavailing." *Stringfellow's*, 91 N.Y.2d at 399, 671 N.Y.S.2d 406, 694 N.E.2d 407. As the Supreme Court has stated: "It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383, 88 S.Ct. 1673, 1682, 20 L.Ed.2d 672 (1968); *see also In re Town of Islip v. Caviglia*, 73 N.Y.2d 544, 552 n. 2, 542 N.Y.S.2d 139, 540 N.E.2d 215 (1989) ("[C]ourts do not invalidate a municipal zoning ordinance simply because one or more legislators sought to suppress protected expression.").

Accordingly, this Court finds that the Ramapo ordinance does not impermissibly restrict protected First Amendment expression based on its content and is a valid content-neutral, time, place and manner regulation.

## II Prior Restraint

 As described above, the Local Law includes adult businesses among the conditional uses which are subject to Planning Board Approval. The ordinance impermissibly confers on Town officials unrestrained discretion in approving future adult uses. *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (reversing convictions entered under ordinance that allowed city commissioners to grant or deny parade license based on their ideas of public welfare, peace, safety, health, decency, good order, morals or convenience.). The Court in *Shuttlesworth* continued:

> [A]n ordinance which … makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

394 U.S. at 151, 89 S.Ct. at 938–39 (internal quotations omitted); *see also FW/PBS v. City of Dallas*, 493 U.S. 215, 225, 110 S.Ct. 596, 604, 107 L.Ed.2d 603 (1990) ("While prior restraints are not unconstitutional per se any system of prior restraint comes to this Court bearing a heavy presumption against its constitutional validity."); *Staub v. City of Baxley*, 355 U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302 (1958) ("general welfare" standard too indefinite); *414 Theater Corp. v. Murphy*, 499 F.2d 1155, 1156 n. 1, 1159 (2d Cir.1974) ("welfare and benefit of the people of and visitors to the city" standard too indefinite); *accord Diamond v. City of Taft*, 29 F.Supp.2d 633, 648–49, 650 (E.D.Ca.1998) (ordinance mandate that adult uses be granted permits only where "deemed essential or desirable to the public convenience or welfare" impermissibly vested City Council with "unfettered discretion and raise[d] the spectre of selective enforcement on the basis of the content of speech.") (internal quotations omitted).

The Code requires members of the Planning Board to deny permits on the basis of their views as to health, safety, comfort and convenience and "any other additional standards, conditions and requirements, including a limitation on hours of operation, as it may deem necessary or appropriate to promote the public health, safety and welfare and to otherwise implement the intent of this chapter." Article XII, Section 376–120(G).

These standards suffer from a variety of deficiencies. They are vague and essentially subjective. They fail adequately to advise applicants of whether, and under what circumstances, constitutionally protected activities can be pursued. They facilitate restrictions on activities that may, in fact, not be prohibited by the ordinance. In sum, they offer no meaningful guidance to the Planning Board as to how to conduct its affairs to facilitate ap-

propriate public, and meaningful judicial, scrutiny in a constitutionally sensitive area.

As our Court of Appeals cautioned in *Charette:*

> When a municipality has adopted a regulatory scheme that requires a business to obtain a permit to operate regardless of its location, that scheme must set objective standards governing the grant or denial of license applications, in order to ensure that the officials not have the "power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *City of Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 759, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham, Ala.,* 394 U.S. 147, 150–51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

159 F.3d at 754.

In sum, the ordinance is unconstitutional in that it does not assign adult businesses to a particular use group and makes them subject to conditional approval of the Town Planning Board which has overly broad discretion to deny permit applications.

## III Reasonable Alternative Avenues of Expression

The Statute is also unconstitutional because it does not provide reasonable alternative avenues of expression. The First Amendment requires the Town to prove that an adequate number of sites exist where all forms of adult uses would be permitted as a matter of right and that such potential sites are part of the community's actual business and real estate market. *See, e.g., Charette,* 159 F.3d 749; *801 Conklin Street, Ltd. v. Town of Babylon,* 38 F.Supp.2d 228 (E.D.N.Y.1999); *accord*

*Walnut Properties, Inc. v. City of Whittier,* 861 F.2d 1102, 1107–09 (9th Cir.1988) (statute imposing 1,000 foot separation between adult businesses which would allow only a small handful of adult businesses to operate within city did not provide reasonable alternative avenues of expression).

Courts have grappled with what constitutes reasonable alternatives avenues and there is no bright-line rule or constitutional minimum required under *Renton. See University Books and Videos, Inc. v. Metropolitan Dade County,* 33 F.Supp.2d 1364, 1370 (S.D.Fla.1999). New York courts have found sufficient alternatives where ample space exists for adult uses and enforcement of the regulation will not substantially reduce the total number of adult use outlets or significantly reduce accessibility to those outlets. *See Stringfellow's,* 91 N.Y.2d at 402, 671 N.Y.S.2d at 417, 694 N.E.2d 407; *Town of Islip v. Caviglia,* 73 N.Y.2d 544, 555, 542 N.Y.S.2d 139, 144, 540 N.E.2d 215 (1989). Factors relevant to this analysis include: (1) accessibility to the general public, (2) surrounding infrastructure, (3) pragmatic likelihood of the space ever becoming available, and (4) whether sites are suitable for some generic commercial enterprise. *801 Conklin Street,* 38 F.Supp.2d at 241; *Stringfellow's,* 91 N.Y.2d at 402, 671 N.Y.S.2d at 418, 694 N.E.2d 407. The Town failed to meet this burden in light of the numerous restrictions and deficiencies in the sites proposed by the Town and the lack of evidence demonstrating the developability of this land.

In contrast to the Ramapo ordinance, which, as T & As proved, allocated less than .6% of the available land for adult entertainment, the recent New York City Adult Use Legislation upheld in *Stringfellow's, supra, Hickerson, supra* and *Buzzetti, supra,* permitted properties for adult uses in the five boroughs of New York City amounting to over 11% of the total area[7] of New York City and then was

---

7. The "total area" base for determining the

percentage of land available in New York City

reduced to 4% by excluding properties not legally available. *Id.* In *Renton, supra,* the City of Renton left available over 5% of the entire land [8] of Renton for use by adult establishments. *Renton,* 475 U.S. at 53, 106 S.Ct. at 932. *See also Nakatomi Investments, Inc. v. City of Schenectady,* 949 F.Supp. 988, 1001 (N.D.N.Y.1997). In *O'Malley v. City of Syracuse,* 813 F.Supp. 133, 146–147 (N.D.N.Y.1993), the municipality left open 4% of the entire area of the municipality. In *Town of Islip,* the municipality left over 10% of its entire area for adult uses. *Town of Islip,* 73 N.Y.2d at 549, 555, 542 N.Y.S.2d at 140, 144, 540 N.E.2d 215. (The total Town area was 58,880 acres and it left open 6,000 acres). Other cases have held that much higher percentages of available land constitute reasonable alternative avenues of expression. *See, e.g., Tri–State Video Corp.,* 1998 WL 72331, at \*8 (citing cases).

To be sure, the fact that establishments like T & A's must "fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation" and Ramapo is not compelled to insure that any speech related business will be able to obtain sites at bargain prices. *Renton,* 475 U.S. at 41, 106 S.Ct. at 932. However, the amount of usable land reserved by Ramapo is *de minimis* and is far smaller than the amount that passed constitutional muster in litigation involving other municipalities and, consequently, denies T & A the reasonable alternative avenues of expression to which it is entitled. As a practical matter, the ordinance, as drafted, effectively prohibits a constitutionally protected activity in the Town of Ramapo. *Id.* at 53, 106 S.Ct. at 932; *Stringfellow's,* 91 N.Y.2d 382, 402–04, 671 N.Y.S.2d 406, 417–19, 694 N.E.2d 407.

did not exclude parkland and roads as the "developable area" figure does in this case.

## CONCLUSION

For the foregoing reasons Local Law No. 3–1997 is unconstitutional and its application to T & A's is enjoined.

**SO ORDERED.**

8. Renton also included parkland and roads in its "entire land" figure.